228 F.2d 170
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
PACIFIC INTERMOUNTAIN EXPRESS COMPANY, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Over-The-Road and City Transfer Drivers, Helpers, Dockmen & Warehousemen, Local No. 41, AFL, Respondents.
 No. 15318.
 United States Court of Appeals Eighth Circuit.
 December 23, 1955.
 Rehearing Denied February 7, 1956.
 
 Rose Mary Filipowicz, Atty., N. L. R. B., Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty. N. L. R. B., Washington, D. C., were with her on the brief), for petitioner.
 Harry L. Browne, Kansas City, Mo. (Raymond F. Beagle, Jr., and Spencer, Fane, Britt & Browne, Kansas City, Mo., were with him on the brief), for respondent Pac. Intermountain Exp. Co.
 John J. Manning, Kansas City, Mo., for respondent International Brotherhood of Teamsters, etc., Local No. 41, AFL.
 Before JOHNSEN, COLLET, and VAN OOSTERHOUT, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 The National Labor Relations Board, hereinafter called Board, pursuant to section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., hereinafter called the Act, has petitioned this court for enforcement of an order (reported at 110 NLRB No. 14) issued by it against Pacific Intermountain Express Company, hereinafter called Company, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Over-The-Road and City Transfer Drivers, Helpers, Dockmen & Warehousemen, Local No. 41, AFL, hereinafter called Union. The Company because of alleged violations of its speed and safety regulations had discharged its employee Sanders, and had issued a warning letter to its employee Dunbar. The Board found that no safety regulation had been violated, and that in the action taken against Sanders and Dunbar the Company had violated section 8(a) (1), (3), and (4) of the Act, and that the Union had violated section 8(b) (2) and 8(b) (1) (A) of the Act. The Company and the Union were ordered to cease and desist from the unfair labor practices of which they were found guilty and to make Sanders whole for loss of earnings caused by his discharge. The Company was required to reinstate Sanders and to withdraw the warning letter issued to Dunbar. The Union was directed to notify Sanders and the Company that it had no objection to Sanders' reinstatement, and both Company and Union were required to post appropriate notices.
 
 
 2
 The Company is a motor freight carrier engaged in interstate commerce. Its general offices are located in Oakland, California, with terminals in various States including one in Kansas City, Missouri. The present difficulty arose in the Kansas City, Missouri, district.
 
 
 3
 The principal question for determination is whether the Board's findings are supported by substantial evidence on the record as a whole, and the subsidiary question is whether the Board's reversal of certain credibility findings of the trial examiner was warranted.
 
 
 4
 The law applicable to this case appears to be well established. The scope of review of the decisions of the Board is thoroughly discussed and explained in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456. Upon review we are required to give consideration to the special qualifications of the Board to deal with problems in its field. A reviewing court can not try the case de novo and substitute its judgment for that of the Board. The court is justified in setting aside the Board's decision when it can not conscientiously find that the evidence supporting the Board's decision is substantial when viewed in the light of the record in its entirety including the evidence opposed to the Board's view. The Universal Camera case also charts the course for the courts to follow when the Board disagrees with its trial examiner who has heard the evidence. The Court at page 492 of 340 U.S., at page 467 of 71 S.Ct. states:
 
 
 5
 "* * * The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are `clearly erroneous.' Such a limitation would make so drastic a departure from prior administrative practice that explicitness would be required."
 
 
 6
 And at page 496 of 340 U.S., at page 469 of 71 S.Ct.:
 
 
 7
 "* * * The `substantial evidence' standard is not modified in any way when the Board and its examiner disagree. * * * The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. * * *"
 
 
 8
 See also Federal Communications Commission v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855. The Board's decision may be based upon circumstantial evidence as well as direct evidence. Direct evidence of a purpose to violate a statute is rarely obtainable. N. L. R. B. v. International Union, etc., Local 101, 8 Cir., 216 F.2d 161, 164; Hartsell Mills Co. v. N. L. R. B., 4 Cir., 111 F.2d 291, 293; N. L. R. B. v. Thomason Plywood Corp., 4 Cir., 222 F.2d 364.
 
 
 9
 The evidence in this case was taken before a trial examiner who filed his report with the recommendation that the complaint be dismissed as to both Company and Union. Violation of the Company's rule requiring drivers to observe posted speed regulations was the basis for Sanders' discharge. Sanders had received a warning letter in November 1952, stating that he had exceeded the speed limit in High Hill, Missouri, at 1:30 A. M. on October 31, 1952. Baker, the Company's driver supervisor, and Lohrey, its driver foreman, claim that they personally observed Sanders violate posted speed regulations in three small communities on the night of January 12 and the early morning of January 13, 1953. Sanders denied that he was speeding on any of these occasions and produced evidence to support his contention. In the contract between the Company and the Union the circumstances under which an employee could be discharged are set out, and a driver could not be discharged for violating speed regulations unless a warning letter had been given to the employee for the same offense within the preceding nine months. The examiner found that the evidence did not establish that Sanders and Dunbar violated the Company's speed and safety regulations. Sanders' truck was equipped by the Company with a tachograph. The examiner concluded that the tachograph charts "tipped the scales in favor of Sanders on the speeding issue." There is considerable conflicting evidence in the record on the speeding issue. The respondents contended that the exact point where a speed zone starts could not be pinpointed within several thousand feet on the tachograph chart, and such contention has considerable support. However, the examiner relied upon the fact that the chart at the approximate location of the speed regulation zones in controversy indicated a slowdown for the distance required to pass through such zones. Inasmuch as both the examiner and the Board agreed that neither Sanders nor Dunbar violated any speed laws on January 12 and 13, 1953, and there is ample evidence to support such a finding, we deem it unnecessary to discuss in further detail the extensive evidence relative to the claimed speed violations.
 
 
 10
 Some question is raised as to the admissibility of the tachograph charts in evidence. The tachographs were installed and maintained by the Company. The drivers were required to turn in the tachographs charts. Under such circumstances the charts were admissible as business records under 28 U.S.C. § 1732. The weight to be given the charts was for the determination of the fact-finding body.
 
 
 11
 The Board was warranted in finding that Baker and Lohrey knew there was no foundation for the charges of speed violations by Sanders and Dunbar. Consequently, it is apparent that the disciplinary action taken against the said employees was for reasons other than speeding.
 
 
 12
 The complaint here involved is summarized by the Board in its opinion as follows:
 
 
 13
 "Stated in broad terms, the theory upon which this complaint was primarily litigated was that the Company discharged Sanders and threatened to discharge Dunbar, following the exertion of Union pressures on sympathetic Company officials, because these two employees played a prominent role in a `dissident' employee movement which the Union found objectionable. This dissident movement was directed toward obtaining, through clearly protected activities which included the invocation of Board procedures, a change in the administration of certain contractual `seniority' provisions having an adverse effect on the work assignments of the dissidents.[1] As an additional complementary theory, the General Counsel also set out to establish the Company's independent animus against Sanders and others of the dissident employee group. This theory has as its basis the argument that the dissidents' activities sought to disrupt the harmonious relations between the Company and the Union, and had included action involving the Respondents in a Board complaint proceeding seeking to impose upon them back pay and other financial liabilities."
 
 
 14
 The examiner and the Board are in agreement on findings thus summarized by the Board:
 
 
 15
 "(a) Sanders' prominent leadership of the dissident employee movement; (b) Sanders' prominent role in the invocation of both intra-union rights of appeal to the Union's International body and of Board procedures, as a means of obtaining a favorable resolution of the `seniority' and other disputes of interest to the dissidents; (c) the openly and sometimes violently expressed animosity of the Union leaders towards Sanders because of the nature and extent of his activities; and (d) the Company's knowledge of the basis of the dissidents' dispute with the Union, and of Sanders' prominent role in the dissident movement. He found also that although the Company sought to justify Sanders' discharge on the basis of his alleged violation of posted speed limits while operating a Company truck, the evidence did not tend to establish the factual validity of the speed violations charged to Sanders."
 
 
 16
 The examiner, however, found that evidence was lacking to show that the Union asserted pressure on the Company to effect Sanders' removal, or that the Company was concerned in or affected by the dissident movement or was otherwise interested in resolving the dispute between Sanders and the Union in favor of the latter. Sanders had testified as to various conversations with Company officials to the effect that he was urged by such officials to discontinue the dissident movement, that he was urged to transfer, and that he was told that the Company was under Union pressure to discharge him. The examiner discredited Sanders' testimony as to his conversations with the Company officials. In most of such discussions the Company was represented by Baker and Lohrey. These are the two officials who claimed to have caught Sanders and Dunbar violating speed regulations and whose testimony on the speeding charges was discredited by the examiner. The Board in its opinion expresses reluctance to reverse the trial examiner's credibility findings, carefully reviews the relevant evidence, and concludes:
 
 
 17
 "Upon the clear preponderance of all the relevant evidence including the fact that, on the one occasion provided by the record where the truth or falsity of conflicts between material portions of Baker's and Lohrey's testimony and those of Sanders could be objectively tested, the former were proven false, we are persuaded that the Trial Examiner's resolution of credibility was incorrect and that Sanders' versions of his statements between himself and Company agents on the subject of transferring were more believable, and should be credited."
 
 
 18
 In N. L. R. B. v. Pittsburgh Steamship Co., 337 U.S. 656, at page 659, 69 S. Ct. 1283, at page 1285, 93 L.Ed. 1602, the Supreme Court states:
 
 
 19
 "* * * Thus, in the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next. * * *"
 
 
 20
 We believe that the Board in reversing the credibility findings of the trial examiner followed proper legal standards and reached a permissible conclusion.
 
 
 21
 The Board in its opinion also states that even if the examiner's credibility findings were adopted there is sufficient evidence to support its findings and decision. The facts upon which the Board bases the foregoing conclusion are fully discussed in the Board's published opinion. The printed record here consists of 829 pages and contains evidence supporting the contention of each of the parties. A detailed discussion of all of the conflicting evidence would unduly prolong this opinion without accomplishing any useful purpose. The record clearly discloses that Sanders and his associates were dissatisfied when the Company changed the extra board driving from a rotation basis to a seniority basis. The dissidents complained particularly because the seniority was determined by the Union and upon the basis of length of Union membership rather than length of employment with the Company. Various protests were made to local and national officials of the Company and to local and international officials of the Union. Various Company officials and representatives of the International Union came to Kansas City to investigate the complaints. The Company took the position that the seniority problem was a Union problem, and took no steps to meet the complaints. Some of the dissidents notified the Company that it would be held responsible for damages caused by violations of certain employees' seniority rights. The record supports a finding that both the Company and the Union officials were considerably annoyed and disturbed by the dissidents' persistent claims. Ultimately, at the instigation of the dissidents, proceedings were instituted before the Board which resulted in the finding that there had been seniority discriminations against certain employees. Upon petition for enforcement, N. L. R. B. v. International Brotherhood of Teamsters, etc., 8 Cir., 225 F.2d 343, enforcement of the Board's order was granted as to the employees discriminated against, this court saying, at page 349:
 
 
 22
 "* * * we are allowing the union to be prohibited here from performing or giving effect in any way to the contract provision in the particular situation, not because of its having made the contract provision, but because of the abuse to which it has seen fit to put the provision in the specific situation. This abuse has been such that we think the Board could properly have left the union where it would not be able to make any further possible use of the provision in the particular employment situation, even if the provision itself had been generally valid."
 
 
 23
 Enforcement in the proceedings last referred to was not asked against the Company as the Company satisfied the Board that it was willing to comply with the Board's order.
 
 
 24
 At a recess on the final day of the hearing before the examiner on the dissidents' complaint, Langsdale, who had been an attorney for the Union for 40 years and who was appearing for the Union, found fault with Mrs. Fassig, the General Counsel attorney, because she had conferred with Sanders. The Board found that Mrs. Fassig stated that Sanders had every right to be present as he was an "employee and a member of the Union," to which Langsdale replied, "He may be now, but how long will he be." Contrary to the examiner, the Board found the Union was chargeable with the remarks of its counsel as Langsdale in making the remarks was speaking in the role of attorney for the Union, and that the remarks were consistent with and expressive of the Union's previously displayed animosity to Sanders. Both the Company and the Union contend that the remarks made by the attorney were beyond the scope of his authority. It is no doubt true that Langsdale had no authority as attorney for the Union to make any discharges. However, he had been attorney for the Union for many years, and the remarks were made while he was engaged in representing the Union in litigation in which Sanders was interested.
 
 
 25
 We believe that it was a fact question for the Board as to whether a statement attributed to the attorney reflected the Union's attitude toward Sanders. The Company's attorney was present when Langsdale made the above statement. While immediate knowledge of this incident is disclaimed by the Company, it is not unreasonable for the Board to conclude that the incident was promptly brought to the attention of the Company. At 7 P.M. that very night Baker and Lohrey started their trip to St. Louis, and on the basis of speed violations which they claim they detected on that trip, immediately on arrival in St. Louis they discharged Sanders and warned Dunbar. The Company produced some records to indicate other drivers had been discharged for violations of speed regulations at other terminals of the Company. Baker testified that no such discharges had been previously made at Kansas City. Schaefer, director of employee relations at the Company's home office, testified that the disposition of speed violations was up to the discretion of the driver supervisor. Warning and discharge letters were not automatic. Even in the case of conviction of drivers for more serious traffic offenses, the drivers' general history and record and all pertinent facts would be considered in determining the action to be taken. Schaefer further testified:
 
 
 26
 "Q. Now, you mentioned in cross-examination by Mr. Manning that you don't discharge anyone unless you can make it stick. Would you explain what you mean by that.
 
 
 27
 "A. Well, getting along with these Unions on those matters is not very easy. And the contract is quite explicit. There's a long history of cases, that's why I attend these hearings, and unless we know that under the contract and under the interpretations placed on the contract, by the state boards and by the joint area board, which can give us at least a certain amount of assurance that we won't be forced to take the employee back, we would probably try to find some lesser means of discipline."
 
 
 28
 It is also of some significance that the disciplinary action against Sanders and Dunbar was taken immediately after their arrival in St. Louis about 4 A. M. This gave the supervisor little opportunity to follow the usual practice of reviewing the driver's record and history. The Union's treatment of Sanders was also quite unusual. While Sanders was protesting the Union seniority determinations at the local Union headquarters, he was severely beaten by Clevenger, assistant business agent of the Union, to the extent that hospitalization was required. Clevenger was indicted for assault and pleaded guilty and paid a fine of $100. Clevenger usually represented members of the local union at grievance hearings, both at the local level and the appeal level, although at other times other officers served in such capacity. Clevenger represented Sanders at the grievance hearing at the local level and at the hearing before the Missouri-Kansas Highway Drivers Council, a joint company union appeal board. There is evidence that Sanders had protested against having Clevenger represent him, and that he had supplied the Union officials with information as to sources of evidence. The record justifies the finding that the Union did not protect Sanders' rights with its usual vigor. This ties in to some extent with Schaefer's testimony that employees were ordinarily not discharged for traffic violations unless the Company felt that it could make the discharge stick.
 
 
 29
 We believe that there is substantial evidence when viewed in the light of the record in its entirety to support the findings and decision of the Board.
 
 
 30
 Finally, the Company urges that the Board erred in failing to reconsider its decision and to reopen the record to show that a contrary result was arrived at in the State Employment Compensation proceedings. Before the present case was submitted to the Board, Sanders had applied for and been denied unemployment compensation for a period of three weeks by the Industrial Commission of Missouri, the decision being based upon the finding that Sanders was discharged for cause. Sanders appealed to the Circuit Court of Jackson County, Missouri, which court on December 15, 1954, subsequent to the decision herein by the Board affirmed the decision of the Commission. The Board denied the Company's request to reopen the proceedings by written order, setting out its reasons for so doing. An application for leave to adduce additional evidence is ordinarily addressed to the sound discretion of the court. Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 104, 62 S.Ct. 452, 86 L.Ed. 718. Each fact-finding agency is entitled to make its own decision upon the evidence before it, and the fact that another tribunal has reached a different conclusion upon the same issue arising out of the same transaction does not invalidate any decision which has proper evidentiary support. United Brick & Clay Workers of America v. Deena Artware, 6 Cir., 198 F.2d 637, 642.
 
 
 31
 A careful review of the record leads us to the conclusion that the Board did not abuse its discretion in refusing to reopen the proceedings.
 
 
 32
 The order of the Board will be enforced.
 
 
 33
 COLLET, Circuit Judge, participated in the determination of the result reached in this case but died before the formal adoption of the Court's opinion.
 
 
 
 Notes:
 
 
 [1]
 The Board used the word "dissidents" to refer to a group of Company employees belonging to the Union who objected to the assigning of work on the basis of seniority predicated on the date of acquisition of Union membership, the seniority determination being made by the Union. We shall also so use the term "dissidents."