297 F.2d 286
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HERSHEY CHOCOLATE CORPORATION and Local 464, American Bakery and Confectionery Workers International Union, AFL-CIO, Respondents.
Harry LANDVATER et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 13523.
 No. 13539.
 United States Court of Appeals Third Circuit.
 Argued September 19, 1961.
 Decided December 1, 1961.
 
 Melvin J. Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., N. L. R. B., Washington, D. C., on the brief), for National Labor Relations Board.
 Herbert A. Simon, New York City (Milton M. Levin, New York City, on the brief), for Harry Landvater and others.
 Bernard N. Katz, Philadelphia, Pa. (Meranze, Katz & Spear, Philadelphia, Pa., on the brief), for Local 464.
 Jack A. Riggs, Gilbert Nurick, McNees, Wallace & Nurick, Harrisburg, Pa., for Hershey Chocolate Corp.
 Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 The Board held that Local 464, American Bakery and Confectionery Workers International Union, AFL-CIO (ABC Local 464) was not the successor union to Local 464 Bakery and Confectionery Workers International Union of America (BCW Local 464). Consequently, said the Board, the attempt by ABC 464 to enforce the employment agreement maintenance of membership clause through the employer was unfair labor practice. ABC Local 464 was ordered to desist from that practice and reimburse the employees who had paid union dues as a result of the local's action.
 
 
 2
 The Board's order is based on the theory that ABC Local 464 is not the continuing identity of BCW Local 464. Accordingly the Board held that employees who had originally joined the BCW local did not automatically become members of the ABC local. Therefore the Board, refusing to accept the Arbitrator's decision to the contrary, found ABC Local had been guilty of unfair labor practice in requiring that all members of Local 464 maintain themselves in good standing through paying their dues to ABC Local 464. Factually, the Board's position is impossible to accept from the record.
 
 
 3
 In December 1957 Local 464, Bakery and Confectionery Workers International Union of America was the bargaining representative of the Hershey production and maintenance employees. An employment contract was in being which had as its expiring date December 31, 1958. On or about December 11, 1957 the International was expelled from the AFL-CIO because of internal corruption. Immediately thereafter the AFL-CIO chartered a new international union, American Bakery and Confectionery Workers International Union, AFL-CIO. On the 17th of the same month the BCW Local 464 executive board, with one dissent, voted to call a special membership meeting to consider the adoption of a resolution to disaffiliate from BCW and affiliate with ABC. Notice of the meeting for December 28th was mailed the members of the Local. The notice stated specifically that questions of disaffiliation, affiliation, disposition of assets and status of collective bargaining agreements would be considered. At the meeting, after a review of the pertinent events and discussion, the membership by a vote of 829 to 1[1] adopted a resolution to disaffiliate from BCW; to affiliate with ABC; to transfer all property and contract rights from BCW Local 464 to ABC Local 464; to continue all present officers as officers of ABC Local 464 and otherwise to function as before with only those changes as were necessitated by the shift in affiliation. The resolution stated the reasons for the local's action were (1) the expulsion of BCW from AFL-CIO and (2): "the notoriety and stigmas of dishonesty and unethical dealings which have attached to certain officials of the present International and to the International itself, as an organization." The local's request to ABC International for a charter was granted December 30, 1957. That day it advised Hershey of its change in affiliation, of its intention to maintain the preexisting contractual relationship and that it expected the employer to do the same.
 
 
 4
 At the time the local left the BCW International Union there were about 2,800 employees in the Hershey unit involved. Two thousand of these were members of the local and of that number, 1,700 had authorized checkoffs. After ABC Local 464 took over, about 1,350 employees executed new checkoff authorizations in its favor. All the old officers and executive board members except one and about 90 out of 92 departmental representatives continued in office. ABC 464 assumed administration of the employment contract and, except for dues involved in state court litigation being held in escrow by Hershey, as the Board itself found "* * * the change in affiliation has apparently produced no change in the bargaining relationship with the Employer." The same bargaining relation between Hershey and ABC 464 continued but because the old international union, Bakery and Confectionery Workers, asserted a claim to represent the employees, Hershey filed a representation petition. The Board first held hearings on the particular problem. Later, as various disaffiliation situations nationwide arose from the corruption findings concerning the BCW International, the Board had a special hearing in order to formulize rules for general use. Applying these to its Hershey case the Board, on September 18, 1958, found that a schism had taken place within the local. It directed that there be an election. The latter was held October 14, 1958 and ABC Local 464 won by a four to one margin. The Board certified the local as bargaining representative on October 22, 1958. The next day the local and the employer by agreement accepted and assumed the terms of the March 26, 1957 employment contract. Since then down to the present time ABC Local 464 and Hershey have functioned on collective bargaining in the same manner as since the inception of Local 464. Thereafter there were no intra local membership difficulties except that the employees named in the Board's decision of December 29, 1960 now before us, did nothing. There was no contention by them that ABC Local 464 was not a continuation of the original local in which they held membership. They simply did not pay the union dues for November and December 1958 despite requests for payment. This practice dragged over into 1959. Finally the union, in accordance with the union security clause in the employment contract, asked Hershey to discharge the employees in question. Hershey refused and under the contract the dispute was submitted to arbitration.
 
 
 5
 Dr. William B. Loucks was chosen arbitrator in February of 1959. After a full hearing, briefs, etc., on July 13, 1959 he filed a sixty page Decision and Opinion. From an exhaustive study of the exhibits and testimony with respect to the continuity of Local 464 the Arbitrator held:
 
 
 6
 "There can be no question about the purpose or intent of the membership action in adopting this resolution on December 28, 1957. Clearly, it was to make one, and only one, change in Local 464 — its International affiliation, along with whatever changes in `internal structure,' `rules,' `regulations,' and `procedures' were inherently necessary as a part of this change in International affiliation of the Local. The transfer of `all property (real, personal and intangible), assets, funds and things of any value held in the name of Local 464' to Local 464, ABC, should be noted in particular. This phraseology of the resolution, in the opinion of the Arbitrator, is to be interpreted as including an intent to have the Local 464 (as affiliated with BCW) property right, or asset, inhering in the dues collections which were a part of Paragraph 6(a) of the Agreement then in effect between the Union and the Company, transferred without diminution, or infringement, or weakening in any way, to Local 464 (as affiliated with ABC).
 
 
 7
 "This intent on the part of the Local Union to have its switch in International affiliation mean just that, and that only, is further illustrated by the letter sent by its Counsel to the Company under date of December 30, 1957. (Union Exhibit # 7). In this letter it was stated as follows: `Local 464 is continuing in exactly the same manner as it has functioned hitherto with the exception of the change of International affiliation. We do not deem this as affecting in any way our relationship with you * * * We will continue to live up to our contract responsibilities and obligations and trust that you will do the same with the Local under this new affiliation. The change of International affiliation is no more than that. It is not intended to have any effect upon our contractual relationship nor upon your obligation to submit check off monies to Local 464.'
 
 
 8
 * * * * * *
 
 
 9
 "There is no doubt in the Arbitrator's mind that it was the intent of Local 464, concurred in either actively or passively by the overwhelming majority of the members of Local 464, BCW, and that it was the intent of the Company, that Local 464's change in international affiliation should mean nothing other than just that — that everything in the Agreement made March 26, 1957, should stay precisely as it had been, including the maintenance of membership obligation upon all individual Union members. It was their mutual intent that Local 464, ABC, should perform all obligations formerly adhering to Local 464, BCW, and should possess all of the contractual rights and privileges formerly possessed by Local 464, BCW, in the same degree as would have been the case had Local 464, ABC, been the original signatory to the Agreement of March 26, 1957. The rights of the Local Union and the Company to have this intent completely effectuated without hindrance, restriction, or dilution, in the opinion of the Arbitrator, originates in the following fact fully supported by the testimony and exhibits before the Arbitrator: The negotiation and union administration of the Agreements prior to disaffiliation had always been by Local 464, BCW, without any aid, direction, or guidance from the BCW International Union."
 
 
 10
 * * * * * *
 
 
 11
 "The Arbitrator's conclusions on the matters of the Local Union intent, the Company intent, and the intents of the individual employees involved, clearly add up to an over-all conclusion that Local 464, ABC, functioning as a party to the current Agreement at the time of the hearing, was in fact the same Union entity which was so functioning prior to the disaffiliation action of December 28, 1957."
 
 
 12
 As to evidence of the reality of a BCW Local after disaffiliation, the Arbitrator held:
 
 
 13
 "It is the considered opinion of the Arbitrator, on the basis of all of the evidence before him, that a Local 464, BCW, was maintained subsequent to December 28, 1957, on a paper or phantom basis, without substance, and solely by the International BCW as an outpost in Hershey. There is no convincing evidence before the Arbitrator indicating that a Local 464, BCW, in any realistic sense of the term existed in Hershey during that period, or that whatever so-called Local 464, BCW, did officially exist there was prepared to carry the Union obligations under, or administer the terms of, the Agreement then in effect."
 
 
 14
 * * * * * *
 
 
 15
 "For these reasons the Arbitrator rejects the contention that there was a bona fide Local 464, BCW, existing and functioning in Hershey during the period immediately following the disaffiliation meeting of December 28, 1957. Since such a Union cannot as a fact be found to have been in existence, it is impossible to accept the contention that, subsequent to December 28, 1957, the maintenance of membership obligation as a condition of employment, under Paragraph 6(a) of the Agreement, was to that Local Union and therefore could not be to Local 464, ABC, as the Union party to this case insists. Since this argument is, in the opinion of the Arbitrator, not supported by the facts, there appears to be no valid reason why the clear mutual intent of the Union and the Company, as described earlier in this Opinion, should not be ordered into effect by the Arbitrator."
 
 
 16
 Concerning the twenty employees for whom the Board ordered reimbursement of dues paid, the Arbitrator found:
 
 
 17
 "After closely studying the testimony of the three witnesses, Mr. Garrison, Mr. Pitzenberger, and Mr. Powell, the Arbitrator cannot conclude that the twenty individuals here involved sincerely held reasons which, to themselves, were good and sufficient reasons for their apparently strong opposition feelings on the disaffiliation matter. The Arbitrator does not find in the testimony of the three witnesses any substantial factual support for Private Counsel's suggestion that the preferences of these individuals for BCW over ABC were based upon logical and soundly conceived differences between BCW and ABC.
 
 
 18
 * * * * * *
 
 
 19
 "By way of over-all evaluation of the intent of the group of twenty employees involved here, the testimony of the three witnesses from among the group leaves the Arbitrator no choice other than to regard them as a dissident group whose intent was to keep the matter of their own union status as uncertain, unclear, and unresolved as possible for some purpose on which the Arbitrator could only speculate if he felt called upon to do so."
 
 
 20
 At the start of the arbitration proceedings there remained only twenty employees who had not paid dues. After the decision Hershey explained to those people their obligation under it to pay dues delinquencies. Nineteen of the twenty thereafter did pay. The twentieth employee had meanwhile terminated his Hershey job. In August of 1959 the local submitted to Hershey the names of ninety additional employees who had failed to pay dues. The Company also asked them to do so. It did not discharge any employee because of non payment of dues.
 
 
 21
 In September of 1959 two of the twenty employees, Powell and Landvater, alleging that the forcing of dues payment to ABC Local 464 was unfair labor practice, filed charges with the Board. A complaint was issued and after hearing the Board upheld the charges. It concluded that ABC Local 464 was not the continuation of the original local but in effect a splinter group, the result of a schism in the local. It decided that the arbitration award was no defense to the unfair labor practices which it had found had been committed by Respondents. It ordered reimbursement by the union of dues paid by employees where requests for payment had been sent within six months (the statutory period of limitation) of the commission of the unfair labor practice.
 
 
 22
 ABC Local 464 objects to enforcement of the Board's order. Landvater and Powell's Administratrix think the order should be modified to include reimbursement to all employees to whom Hershey sent letters insisting they pay delinquent dues. Hershey appears affirmatively, urging that in the event the unfair labor practice as determined by the Board be sustained, reimbursement by the union alone should also be approved.
 
 
 23
 The Board, in its election case (Hershey Chocolate Corporation, 121 N.L.R.B. 901 (1958)), decided that the local which was a party to the employment contract with Hershey was a different local than ABC Local 464; therefore the maintenance of membership clause in the contract could not be used to force payment of dues to ABC Local 464.
 
 
 24
 The Board's present finding, as it states in its decision, depends completely upon "its schism determination". Unfortunately the latter seems to emanate from the arbitrary inclusion of the sui generis Hershey facts within a broad policy adopted by the Board for dealing with problems arising throughout the country after the expulsion of the BCW International from the AFL-CIO.
 
 
 25
 The general principles detailed in the Board's election decision, supra, under the caption "The elements of a schism" say that it must first "* * * be satisfied that the existing contract can no longer serve to promote industrial stability * * *." The local action must occur "* * * in the context of a basic intra union conflict, and not otherwise." The Board sets out that "* * * we deem a basic intra union conflict to be any conflict over policy at the highest level of an international union, * * *." With the broad test for a schism fixed, the Board in one sentence would draw the Hershey situation within it by asserting "With respect to the instant case, the facts set forth above show a policy conflict within the AFL-CIO resulting in the expulsion of BCW on grounds of alleged corruption and the chartering of ABC with substantially the same jurisdiction; these facts establish the existence of a basic intra union conflict."
 
 
 26
 On the Board's own requirements, without which, says the Board, a schism cannot exist, there was no schism here. The labor contract under which Hershey and its employees have been living from 1957 down to the present is the best evidence of the Hershey employer-employee stability. And there was no "basic intra union conflict." The BCW International was found guilty of corruption by the AFL-CIO and expelled. We see no evidence of a quarrel within the AFL-CIO as to whether it should countenance the corruption and retain BCW. The only issue apparent was, did the charged corruption exist. Once it was so determined, the expulsion of BCW and the chartering of ABC as the Board put it "with substantially the same jurisdiction" was bound to follow.
 
 
 27
 If it be assumed that "a basic intra union policy" conflict had existed there must have been a real division into factions or opposing bodies because of the conflict in order to constitute a schism. That did not occur. The Board concedes that there was prompt open meeting action by the local which "* * * was co-extensive in scope with the existing unit;". It was always the local action which controlled 464 and motivated it from its top rulings down through its ordinary routine. All of the bargaining and representation was on that level. The local's response to the BCW International mess was a united movement by the members to hold fast to their own local and merely change its international connection. There was no substance change in the local. In immediate notification of its position to the employer, the local stressed its "continuance in exactly the same manner as it has functioned hitherto with the exception of the change of international affiliation." It told the employer:
 
 
 28
 "We do not deem this as affecting in any way our relationship with you or the company. We will continue to live up to our contract responsibilities and obligations and trust that you will do the same with the local under this new affiliation."
 
 
 29
 The officers, the 50 member executive board, the 92 shop representatives remained substantially the same. The local's office, telephone number, books, all were as before. Its method of dealing with the employer was as it had been through the years. It went on functioning under its old constitution and by-laws; held its regular elections in February 1958. It has been just that way through the new election and certification interval until now. The same local merely changed its international hat. It clearly had a certain true dignity, a pride in itself. It neither sought to be nor was it trapped into becoming some sort of a dissident faction. It remained Local 464, repudiating in its stride the unworthy international and, without breaking a step, taking on a new and honorable association with the ABC International. Local 464, with only a loose link to BCW International, from virtually the moment the necessity of severing that tie was apparent, focused on the single objective of preserving itself. Its every move thereafter was to this end. The record leaves no possible doubt of its deserved success.
 
 
 30
 The change in name is urged as an element of the local's newness. That sort of surface dissimilarity points up the need of facing the facts instead of attempting to apply a rigid over-all pattern which may have fitted in some instances but offers no fair solution to the Hershey situation. From all the evidence it must be concluded that the choosing of a new international and indicating that relationship in its name was not a secession movement from the old local. It was merely the local's members acceptance of the bitter truth that though they and their organization were innocent there was no viable future for them with the BCW International. So, dropping the connection they discarded the soiled name. Joining the ABC International, they included that name in their local masthead and in keeping with their own decency. The old union has not disappeared. Throughout the entire critical time it has operated as the Hershey employees bargaining unit without interruption and successfully. Nor has that operation been in competition with a rival union. There is no substantial evidence in the record which would justify the conclusion that there is other than a paper BCW local at Hershey.
 
 
 31
 In recognizing that the individuality and identity of Local 464 remained intact we are following N.L.R.B. practice and sound labor law. To survive it was forced to end its dealings with the discredited international. In accomplishing this it publicly took every possible precaution to hold fast to its own entity. What more could have been expected of the local to establish this fundamental has not been suggested. In Continental Oil Co. v. National Labor Relations Board, 113 F.2d 473, 477 (10 Cir., 1940) one of the questions was "The identity of the union". The Board's order that the employer bargain with the union was challenged by the employer on the ground that the union was a different organization from that which had negotiated the contract and which bore the name "International Association of Oil Field, Gas Well and Refinery Workers of America". Judge Bratton, speaking for the court, said:
 
 
 32
 "Initially the union bore the name of International Association of Oil Field, Gas Well and Refinery Workers of America. It assumed its present name at a convention held in Kansas City in June, 1937. There was no change in officers or central offices; the change was only in name; and continuity of organization was preserved. The designations, correspondence, contracts submitted, and other efforts to bargain collectively on which the order rests, were made, had, submitted, and exerted before the change in name and were therefore in the original name of the union. But the charges were lodged with the Board after the change and were therefore in the new name, and in the order the Board referred to the union in like manner. While it may be said that the change in name included a shift in affiliation from the American Federation of Labor to the Committee for Industrial Organization, there was no such disruption or change of identity as to affect in any manner the validity of the parts of the order requiring petitioner to bargain collectively with the union."
 
 
 33
 National Labor Relations Board v. Harris-Woodson Co., 179 F.2d 720, (4 Cir., 1950) is another important opinion in this special area, where again the circumstances closely parallel those in this appeal. The union there changed its name and its national union affiliation. The court held page 723 in an opinion by Judge Parker:
 
 
 34
 "There is as little substance in the second question raised. It was the local union which the employees chose as their bargaining representative; and the fact that they desired it to represent them in collective bargaining was not affected by its change either of name or affiliation. On the contrary, it is perfectly clear that the only purpose of these changes was that it might be enabled thereby to bargain in behalf of the employees. Metaphysical arguments as to the nature of the entity with which we are dealing should not be permitted to obscure the substance of what has been done or to furnish a smoke screen behind which the company may with impunity defy the requirements of the statute that it bargain with the representative that its employees have chosen. The identity of that representative, composed entirely of the company's employees, was not changed either by its change of name or its change of affiliation."
 
 
 35
 There had been earlier delays in that matter and the opinion concluded:
 
 
 36
 "The time has come for it [the employer] to comply with the law without further delay or sophistry. The order of the Board will be enforced."
 
 
 37
 Carpinteria Lemon Ass'n v. National Labor Relations Board, 240 F.2d 554, 557 (9 Cir.1956) squarely states the law of this case when it holds that:
 
 
 38
 "The right of a successor union to assume the status of certified bargaining agent held by its predecessor depends on a factual issue — is the new union a continuation of the old union under a new name or affiliation or is it a substantially different organization?"
 
 
 39
 In supporting the successor union's continuation of the old union under a new name and new affiliation the Board decided factually that all those differentiations amounted to was no more than as the court stated page 557 of 240 F.2d, "* * * merely a change of name and affiliation." It was this finding the court followed.
 
 
 40
 Prudential Insurance Co., 106 N.L.R.B. 237 (1953) dealt with fairly comparable circumstances. The local in that litigation had divorced itself from its international and assumed the employment contract as an independent local. The international set up a trusteeship for the old local and asked the employer to accept it. The Board held, page 241, that the independent local "* * * succeeded to the existing contract with the Employer and is currently the administrator of that contract."
 
 
 41
 In Chesapeake & Potomac Telephone Co., 89 N.L.R.B. 231, 232 (1950), the Board said, "* * * the only change which we note in the character and status of the local union is one of designation and affiliation. There is no question of its continuing and current representative position." That comment could be aptly repeated regarding the unavoidable skeleton measures by Local 464 to preserve its existence and maintain its integrity. Louisville Railway Co., 90 N.L.R.B. 678 (1950) offers another striking resemblance to what happened at Hershey. The local transferred out of its national union to a new group and later joined up with a new national union, the Brotherhood of Railroad Trainmen. 700 members out of a total membership of about 1,120 were in favor of the move. Though as the Board remarked "The facts relating to the contract bar issue are somewhat unusual and complicated", it found no merit to the cry of "schism" which was raised. It noted, page 682, that to warrant the invoking of that doctrine the result of the "schism" must be that "the normal bargaining relationship between the Employer and the theretofore exclusive representative of its employees has become a matter of such confusion that the relationship between them no longer promotes stability in industrial relations."
 
 
 42
 The Board does not discuss the above decisions. It would dispose of them (and all of them are primarily concerned with virtually the Hershey factual picture) by the elliptical pronouncement that they are "inapposite".
 
 
 43
 The union complains bitterly at the failure of the Board to accept the arbitration award. We think that under Section 10(a) of the National Labor Relations Act, 29 U.S.C.A. § 160(a) the Board was within its legal authority.[2] But we have serious doubts whether the Board in this instance wisely rejected the arbitration decision. Under the facts we would have been far better satisfied to have seen Dr. Louck's opinion approved. It seems to us that such course would have resulted in the effectuation of the final adjustment policy declared desirable by Section 203(d) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 173(d). United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).
 
 
 44
 We find no merit in the petition for enlargement of the Board's order and to review and modify that order. The petition will be dismissed.
 
 
 45
 The petition of the Board for enforcement of its order will be denied.
 
 
 
 Notes:
 
 
 [1]
 John E. Powell, the sole dissenter, has since died
 
 
 [2]
 Section 10(a) sets out that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *." And see N. L. R. B. v. International Union United Auto Workers, 194 F.2d 698, 702 (7 Cir., 1952); N. L. R. B. v. Walt Disney Productions, 146 F.2d 44 (9 Cir., 1944); N. L. R. B. v. Bell Aircraft Corp., 206 F.2d 235 (2 Cir., 1953); N. L. R. B. v. Monsanto Chemical Co., 97 N.L.R.B. 517 (1951), enforced 205 F.2d 763 (8 Cir., 1953); N. L. R. B. v. Pacific Intermountain Express Co., 228 F.2d 170, 176 (8 Cir., 1955), cert. den. 351 U.S. 952, 76 S.Ct. 850, 100 L.Ed. 1476 (1956)