Walter J. DABRAVALSKIE

v.

John W. GARDNER, Secretary of Health,
Education and Welfare, United States
of America.

No. 42764.

United States District Court
E. D. Pennsylvania.

March 26, 1968.

Harry W. Lightstone, Pottsville, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This action is brought under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. The final decision in this case is that of the Appeals Council dated March 20, 1967, denying the plaintiff's request for the review of a decision rendered by the hearing examiner on November 22, 1966, in which the examiner denied the plaintiff benefits under Section 216(i) and Section 223, respectively, of the Social Security Act.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). This Court has no authority to hear the case *de novo*. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Mauldin v. Celebrezze, 260 F.Supp. 287 (D.C.S.C.1966). The question here involved, therefore, is whether there is substantial evidence to support the Secretary's decision. To answer this question, it is the duty of this Court to look at the record as a whole. Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958); Klimaszewski v. Flemming, 176 F.Supp. 927 (E.D.Pa. 1959).

The test for disability consists principally of two parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in substantial gainful activity. Stancavage v. Celebrezze, 323 F.2d 373 (3rd Cir. 1963); Klimaszewski v. Flemming, supra, 176 F.Supp. at page 931.

"Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Consolo v. Federal Maritime Commission, 383

U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L. Ed.2d 131 (1966); Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229 (1938). It must be enough, if the trial were to a jury, to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If there is only a slight preponderance of the evidence on one side or the other, the Secretary's finding should be affirmed. Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

There are four elements of proof to be considered in making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965); Thomas v. Celebrezze, supra, 331 F.2d, at 545; Underwood v. Ribicoff, supra, 298 F.2d, at 851.

We proceed to a consideration of the evidence in this case in the light of these elements of proof.

At the hearing held before the examiner on October 13, 1966, the examiner briefly reviewed, for the benefit of the plaintiff, the procedures and formalities of the hearing. Plaintiff was advised that the procedure is "informal", that Mr. Frank, a vocational consultant, would testify, and that Dr. Laigon, the plaintiff's physician, would also testify. Plaintiff was not advised that a considerable amount of evidence, already in the record by way of exhibits, would also be considered. Plaintiff, not being represented by counsel, made no appropriate inquiries regarding such exhibits and was given no opportunity to reply to same or to produce testimony with respect thereto.

Moreover, the informalities of the proceeding, the plaintiff's lack of representation by counsel and a "mix-up" prior to the taking of testimony may have substantially circumscribed the plaintiff's opportunities to present his case, in that Dr. Laigon had been kept waiting for "some time", was obviously anxious to get away and the brevity of his testimony would indicate that more emphasis was placed upon the doctor's early departure than upon a complete presentation of his testimony. (p. 20)

The doctor was not given the benefit of the plaintiff's testimony before testifying. On the contrary, plaintiff was asked only two questions, none of which related to his complaints or his condition, (p. 21) and Dr. Laigon was then called.

Plaintiff's application for benefits was filed on January 19, 1965, alleging inability to work as of January 31, 1964. (p. 43) The examiner, in an obvious effort to cooperate with Dr. Laigon, briefly examined him, and in the absence of plaintiff's testimony, it seems evident that Dr. Laigon's testimony was not expanded as it might have been and probably would have been if such testimony had not been so substantially confined in point of time.

In any event, Dr. Laigon testified that he first saw the plaintiff "in late December 1963" and found him "ill with a febrile illness associated with a severe productive cough". On that basis and at that time, the doctor noted a preliminary "clinical impression" of "severe tracheobronchitis" for which treatment was initiated. (p. 22) Antibiotics, expectorants and bronchodilators were administered. (p. 22) By reason of lack of improvement in the plaintiff's condition and because of the continuation of "exertional dyspnea" X-ray studies were made. They disclosed a second stage anthracosilicosis with moderate pulmonary emphysema. (p. 23) This then was apparently the first time that the existence of anthracosilicosis was determined, at least insofar as Dr. Laigon was concerned. The plaintiff was seen by the doctor bi-weekly and sometimes monthly until August 1964, when there was some symptomatic improvement in plaintiff's condition in that he was coughing less, "but still continued quite dyspneic on effort". (p. 23) In September 1964, application for bene-

fits under the Pennsylvania Occupational Disease Act was filed, followed by the filing, in January 1965, of the application for disability insurance benefits here in question. Application for occupational disease benefits under the Pennsylvania Act, according to the testimony of Dr. Laigon, resulted in an award based upon the plaintiff's "being totally and permanently disabled as a result of anthracosilicosis". (p. 25) In the interests of brevity, Dr. Laigon was not asked his opinion as to plaintiff's condition at the time of the proceedings before the Pennsylvania authorities and it is left only to inference that he may then and there have testified as to the existence of permanent total disability resulting from anthracosilicosis. On the contrary, his opinion, as regards this record, was reflected in his report dated January 26, 1965, (Exhibit No. 20, page 77) wherein, under "History", he refers to the plaintiff's inability to work since February 1964; wherein he refers to the plaintiff's cough, shortness of breath, pulmonary emphysema, and to a diagnosis of anthracosilicosis, stage 2, based upon the objective X-ray findings, all of which he states caused the plaintiff to be "totally disabled for usual work". (p. 77)

■ Inability or incapability of performing "usual" work is one of the tests prescribed by the code of Federal regulations, 20 C.F.R. § 404.1502(b), in defining disability for purposes of the Social Security Act. Thus, the testimony of Dr. Laigon, with supporting exhibit, is sufficient to support an award of benefits if the evidence otherwise of record so indicates.

Other evidence produced at said hearing consisted of the plaintiff's testimony, who, in the absence of counsel and in the absence of legal advice, was more interested in establishing his wage record than in establishing his physical condition. He apparently felt that his physical condition: i. e., the existence of total disability had been adequately established before the Pennsylvania Compensation authorities. If he was of this impression, he was in error. National Labor Relations Board v. Pacific Intermountain Express Co., 228 F.2d 170, 176 (8th Cir. 1955); Lane v. Railroad Retirement Board, 185 F.2d 819 (6th Cir. 1950); Carpenter v. Flemming, 178 F.Supp. 791 (N.D.W.Va.1959).

The record shows that plaintiff has done nothing except unskilled, heavy laborious labor and is apparently qualified to do nothing else. In 1937 and thereafter, he was employed by the Highway Department "breaking cement with a sledge hammer". In 1939 and thereafter, he worked in an explosive plant, handling fifty-pound bags of powder. In 1944 and thereafter, he worked underground in the anthracite mines, doing laborious work as a loader and patcher. He loaded coal, he handled cars, he climbed to the top of coal chutes and forced coal into and out of the chutes, he shoveled and picked coal and, with few exceptions, was engaged in heavy laborious work. (pp. 27–30) Although asked by the examiner, the plaintiff has apparently done no "paper work" in the sense of keeping records, filing records, filing reports, or otherwise working with records.

As regards his daily life, his conduct within and outside the home, establishes no ability to work. His wife and children do the chores and his activities are apparently confined to those of an invalid such as watching TV and reading the newspaper. (pp. 31, 32) He becomes short of breath when walking at a slow pace even for a short distance. He develops shortness of breath, headaches and fatigue. (p. 31) Although he understandably washes, dresses and shaves himself, he performs no household duties and drives a "push-button" 1960 Corvair, no more than about two miles per day. (p. 32)

Thus, plaintiff, born September 10, 1917 (Exhibit 1, page 42), is now fifty years of age and although previously a regular worker, engaged in hard and la-

borious duties, has not worked since 1960.[1]

At the conclusion of plaintiff's testimony, one David S. Frank was called as a vocational consultant. The intended thrust of his testimony was to establish that there is light work available which the plaintiff can perform. He defined "light work" as that involving the lifting of a maximum of twenty pounds and/or the carrying of objects weighing not more than ten pounds. (p. 35) "Sedentary" work he defined as lifting not more than a maximum of ten pounds and "occasionally" lifting or carrying articles such as "dockets, ledgers and small tools". By definition, it is obvious that one who has difficulty in walking as little as twenty steps, one who has difficulty in walking a block and becomes short of breath, cannot possibly, as a regular, continuous and sustained matter, perform either the "light" work or the "sedentary" work as defined by Mr. Frank. He described jobs, which in the language of the witness, "I feel that he would be able to successfully perform". They include "File clerk", "timekeeper", "parts man" and so forth. (p. 36) However, listed on the bulletin board on the morning of the hearing in the area employment office in which plaintiff resides were the following jobs as described by Mr. Frank: "Kitchen helper, punch press operator and short-order cook". (p. 36) It appears doubtful that plaintiff could in fact continuously and on a sustained basis perform the duties of a "kitchen helper". This appears to be equally true of a "short-order cook". However, if plaintiff were able to perform such duties, it is extremely doubtful, with an admitted second stage anthracosilicotic condition, accompanied by emphysema, coughing and expectoration, that he could possibly obtain the required health certificate with which to obtain such a job. Indeed, it would be hoped that he could not because the eating public should not be exposed to the high probability of accompanying tuberculosis so highly prevalent in silicotics and anthracosilicotics. The duties of a "punch press operator" are obviously in a "heavier" category and plaintiff's inability to perform even lighter duties attests to his inability to satisfactorily perform the duties of a punch press operator. The same is equally true of available janitorial duties. Reference by Mr. Frank to "several positions as clerk or clerk-typist" seems to be equally inapplicable to the plaintiff's situation.

Although the testimony of Mr. Frank was apparently heavily relied upon by the examiner in reaching his decision, it is evident that his training, background and experience do not qualify him to express himself in this case. Reference to Exhibit No. 31, page 101, will disclose that his past experience has been that of a "guidance counsellor" in various junior and junior-senior high schools located in Newport, Pennsylvania, and later in Dillsburg, Pennsylvania, from 1958 to 1964. Obviously, his exposure to and experience with high school graduates, none of whom suffer any occupational disability, none of whom are silicotics or anthracosilicotics, can hardly be said to qualify him to express a valid and substantial opinion in the instant case. By the same token, his duties as an "assistant in guidance" at the University of West Virginia since September 1, 1964, would likewise give him no insight (a) into the problems incident to the physical impairment of an anthracosilicotic, (b) into the local characteristics and possible peculiarities incident to employment in the anthracite coal fields.[2] We cannot in good con-

---

1. In good conscience it cannot be suspected that plaintiff is a malingerer living on occupational disease benefits received from the Commonwealth of Pennsylvania because such benefits were not received until sometime subsequent to September 1964. (p. 24).

2. It is evident that anthracite, as such, exists and has been mined and recovered only in a small area consisting of not more than approximately five counties located in northeastern Pennsylvania. Anthracosilicosis is peculiar to that area. While the condition bears similarity to

science consider such evidence as "substantial" in this case.

Other evidence was introduced solely by exhibits. Throughout the record there are reports of interviews by claims representatives with the plaintiff, where something, and sometimes much, is made of the fact that the plaintiff has no tremors, no deformities and sits and stands without apparent difficulty. (For example, see Exhibit 11, page 65.) Obviously, anthracosilicosis does not create deformities, does not create tremors and does not prevent a man from sitting or walking. Such observations, within the confines of a limited interview, give no consideration to the results of such disease on exertion and on sustained effort. Any lack of medical attention of a concentrated nature, is explained by the fact that the plaintiff does not feel that medical attention will do him any substantial good and that his condition will "get worse". (p. 13) This is true of the condition of anthracosilicosis. Thus far, the medical profession has accomplished little or nothing by way of arresting the progress of this insidious disease.

Exhibit 21 (p. 79 et seq.) discloses that the plaintiff suffers, as previously indicated, shortness of breath, constant cough and weakness, all the result of a second stage anthracosilicosis with emphysema. Dr. Weaver, noting dyspnea, "barrelchestedness", and a decrease in vital capacity, concludes that plaintiff is totally and permanently disabled and, after labeling the condition as "progressive", concludes "no exertion allowed". Such evidence does not support the findings and conclusions of the examiner.

Dr. Corazza apparently saw the plaintiff on one occasion only and, like all other witnesses, found the plaintiff suffering from anthracosilicosis. If we read his report correctly, he found maximum breathing capacity of only forty-three per cent. (p. 83) It is unlikely that an individual with a maximum breathing capacity of only forty-three per cent could, on a sustained basis, perform either light or sedentary work.

Dr. Corazza suggested that the lack of breathing capacity may be the result of "lack of effort" on the part of the plaintiff. This then suggested that a psychiatric condition might be involved for which plaintiff was apparently referred to Dr. John T. Delehanty (Exhibit 24, pages 92 and 93). Although the facts are to the contrary, Dr. Delehanty suggested that plaintiff had received no medical attention since 1954. (p. 93) If he assumed this as a fact, his opinion might well have been mistakenly influenced. Aside from this, he too found plaintiff suffering from "bizarre breathing patterns" and concluded with the "possibility that the patient's affect might be just a little bit flattened". (p. 93) His was apparently a psychiatric examination with emphasis on plaintiff's mental condition and with little reference to his anthracosilicotic condition.

However, Dr. Grynkewich (Exhibit 23, page 88 et seq.) found the plaintiff "cooperative" and he too found stage two anthracosilicosis. (p. 89) He found "ventilatory difficulty". (p. 90) He likewise found pulmonary insufficiency, and "hyperventilation syndrome", all obviously related to anthracosilicosis.

We have thus reviewed the evidence in considerable detail in order to determine whether the findings and conclusions of the examiner, as affirmed by the Appeals Council, is supported by substantial evidence.

silicosis contracted in the bituminous and soft-coal fields of Pennsylvania and elsewhere, it is, nonetheless, not identical and its results peculiar. Mr. Frank's experiences in Newport, Dillsburg and elsewhere, where no anthracite exists and where there are no anthracosilicotics, would not qualify him to express an opinion as to employment in the anthracite field, where for years unemployment was the highest in the nation. Of greater importance, is his complete lack of knowledge of anthracosilicotics, the symptoms from which they suffer, the effects of those symptoms on their ability to work and the constant and insidious development of this unfortunate occupational disease.

Turning now to the examiner's decision, it will be noted that in summarizing the plaintiff's statements and allegations, he recognizes the existence of anthracosilicosis as determined by X-ray findings, the fact that plaintiff was, as early as 1964, advised not to work because of such condition, the fact that plaintiff noticed shortness of breath as early as 1963, the fact that he has not worked since 1960, the fact that he is short of breath after walking a block or less, the fact that he has headaches, shortness of breath, fatigue and chest pains and that he has been awarded benefits by the Pennsylvania compensation authorities.

In summarizing the medical evidence produced, the examiner recognizes plaintiff's total disability to do his usual work, the existence of a stage two anthracosilicosis, the existence of pulmonary emphysema, the fact that at least one medical report suggests that "no exertion was allowed", the existence of wheezing with shortness of breath and coughing with expectoration, soreness or pain in the chest, a decreased maximum breathing capacity, pulmonary insufficiency and fatigue.

In evaluating the medical and other evidence of record, the examiner recognizes, by way of reference to the code of Federal regulations, that a disease of the lungs evidenced by X-rays and other objective findings, when producing breathlessness, pain or fatigue on slight exertion, "such as walking several blocks * * * or doing small chores", is an example of an "impairment which would ordinarily be considered as preventing substantial, gainful activity". (p. 9) That is precisely what is involved in the instant case. Additionally, the examiner recognizes other references to the code of Federal regulations which suggest that "an alleged impairment is medically de-

terminable only if it can be verified by the use of clinical and laboratory diagnostic techniques". (p. 10) In the instant case, it is uncontradicted that the existence of anthracosilicosis has been unequivocally established by X-ray studies and by other clinical studies with particular reference to the lungs, such as the tests involving maximum breathing capacity. The examiner refers to the report of Dr. Weaver as being unsupported by clinical and other information. However, other sources of medical information based upon X-ray and clinical studies, clearly established the soundness of Dr. Weaver's conclusions. The language of the examiner's decision appears to be devoted less to an objective review of the evidence than to justification for his ultimate findings. This is perhaps best demonstrated by language to the effect that "extensive studies disclose *only* anthracosilicosis, stage two, with no significant evidence of emphysema". (p. 12) To suggest that the plaintiff suffers *only* anthracosilicosis is to ignore the fact that this disease is in and of itself, and without complications, many times totally disabling.[3]

To justify his conclusions, the examiner (p. 12) went outside the record and quoted from an article written by Professor Christie of McGill University, on the subject of pneumoconiosis as follows: "A radiological diagnosis of silicosis is compatible with perfect health and there *may* be unimpaired work capacity for many years after the disease is recognized". In so stating, the examiner overlooks that "pneumoconiosis" and "anthracosilicosis", although related symptomatically, are not precisely the same condition. This is best evidenced by the fact that in 1965, although "anthracosilicosis" was for many years a compensable condition under the Pennsylvania Occupational Disease Act, the Legislature, nonetheless, found it necessary to amend the

---

3. Men in their late 30's and early 40's have been adjudicated permanently and totally disabled by the proper Pennsylvania authorities. On the contrary, other men in their late 60's and early 70's with an equal or greater amount of anthracosilicosis have continued to work without disability, complaint or loss of earning power.

Act to include as an *additional* compensable condition "coal miner's pneumoconiosis". The difference as we understand it in the language of a layman is that "anthracosilicosis" is contracted by reason of the inhalation of coal dust and rock dust (free silica) whereas pneumoconiosis is contracted by reason of the inhalation of coal dust only.[4]

In any event it matters not what Professor Christie may say as regards the average man or as regards the "standard" man. As was said in Klimaszewski v. Flemming, supra, 176 F.Supp. at 931:

> " * * * However, the definition of disability cannot be considered in vacuo. The definition relates to the individual claimant. 'The act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has'. Dunn v. Folsom, D.C.W.D.Ark. 1958, 166 F.Supp. 44, 48."

Other language in the *Klimaszewski* case likewise becomes pertinent. There, as here, it was suggested that the plaintiff could resort to employment of a clerical nature, quite unlike the duties which he had performed throughout his entire lifetime. The Court stated at page 932:

> " * * * Thirty-one years as a stevedore is hardly qualification for any task which requires skilled manual dexterity or the use of figures or letters. * * * "

In concluding, the Court stated at page 932:

> " * * * It was not the intention of Congress to impose a test so severe as that required by the Secretary and to exact as a condition precedent to the maintenance of a claim the elimina-

tion of every possibility of gainful employment."

A situation almost parallel to that involved in the instant case is found in the case of Stancavage v. Celebrezze, supra. There, as here, plaintiff suffered shortness of breath, coughing with expectoration, inability to work, pains in the chest and shortness of breath when walking "about two blocks", headaches, and spent his time "lying about" the house watching television and taking short walks. There, as here, the plaintiff had not been employed since leaving the mines. There, as here, he suffered from anthracosilicosis with emphysema, impaired vital capacity and dyspnea. Maximum breathing capacity there was sixty-eight per cent and here, in one instance, forty-three per cent. There, as here, it was alleged that plaintiff failed to exert "maximal effort" in doing the maximum breathing capacity test. There, as here, the blood studies "were within normal limits". There, as here, the Secretary relied upon jobs "as defined in the dictionary of occupational titles".

In reversing the District Court and remanding the record, the Court said as follows at page 377, of 323 F.2d:

> "We recognize that the use of governmental and industrial studies such as the one referred to by the Appeals Council in the present case has been permitted without objection on occasion and approved of as warranting the Secretary's determination of what employment opportunities are available to a claimant. Having in mind the sincere, practical administration of the Act, however, we are not persuaded that such evidence moves far enough away from the realm of conjecture and theory when applied to the facts before us. It is too much akin to the employment Hodgson was supposed to

4. Because seams of anthracite, unlike bituminous coal, are always overlaid and underlaid with sandrock, it appears evident that anthracite miners will, in all probability, always suffer "silicosis" whereas bituminous miners, operating in

areas where there is no rock, will inhale coal dust only and therefore contract what is known as "pneumoconiosis" as opposed to "silicosis" or what is here and otherwise described in the anthracite region as "anthracosilicosis".

be able to secure as an elevator operator. The suggestion that there is a list of '221 jobs that can be performed by persons with minimal education and that are sedentary in character or require only light exertion' is not very meaningful. There must be something more tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson."

■ True, in the instant case, the Secretary has sought to supply, through the testimony of Mr. Frank, vocational consultant, testimony of a more specific nature than that offered in the *Stancavage* case. However, for the reasons heretofore stated, the testimony of Mr. Frank fails to meet such burden. His complete unfamiliarity with the anthracite region, with job opportunities therein, and his like unfamiliarity with the effects of anthracosilicosis, while not rendering his testimony legally incompetent, detracts therefrom sufficiently as to render the same insubstantial. Moreover, his past experience with high school students adds nothing. Such a theoretical approach to the establishment of job opportunity will fail. The testimony of Mr. Frank is unacceptable.

■ In the case of Bujnovsky v. Celebrezze, 343 F.2d 868 (3rd Cir. 1965), as here, plaintiff suffered from a second stage anthracosilicosis with moderate emphysema. Understandably, his complaints and symptoms were almost identical. Although he looked after his personal needs, he did only small chores and took short walks. He suffered from shortness of breath, coughing, weakness, pains in the chest, and fatigue. There, as here, there was medical testimony that he was totally disabled. At page 871, the Court stated: " * * * We agree with the District Court that the plaintiff

has adduced sufficient evidence to put the burden upon the Secretary to show that a reasonable employment opportunity is available to him (the plaintiff)." In affirming the order of the District Court granting the plaintiff's motion for summary judgment, the Court reiterated that the words "substantial gainful activity" must be read in the light of "what is reasonably possible and not what is conceivable * * *. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * * *". (See p. 870) The testimony of Mr. Frank is, in our opinion, insubstantial and uncontrolling because at most he deals with the "theoretical" ability of plaintiff, based upon certain state and government records and, at the most, deals with that which is "conceivable" rather than that which is "reasonably possible". Such testimony is unacceptable.

■ In the case of Dillon v. Celebrezze, supra, as here, the plaintiff was a miner. There, as here, the examiner decided against the plaintiff. Following denial of review by the Appeals Council, the District Court upheld the Appeals Council. The Circuit Court reversed. There, as here, all doctors involved reported the plaintiff was suffering from a physical ailment. Medical evaluations varied to some extent and some of the doctors emphasized different aspects of the plaintiff's problems. There, as here, the condition found on initial examination continued throughout. Similar symptoms and complaints were involved, including shortness of breath, fatigue, limited activities, etc. At page 757 of the opinion, the Court stated: " * * * Furthermore, the question of whether a claimant is disabled, as that term is used in the Act, is an inquiry which must be directed to *that particular individual,* not to a theoretical average man or even to an average claimant". In reversing the District Court and remanding the cause for the entry of summary judgment in favor of the claimant, the Court stated as follows at page 757:

" * * * We think it is a wholly unrealistic application of the statutory standards to hold that an *illiterate person of fifty-four whose only previous work experience involved the hard manual labor of coal mining and who was suffering under the cumulative psychological and physical handicap of these disabilities could be expected to obtain, much less to perform, any substantial gainful activity.* To deny this claimant the disability relief afforded by the Social Security Act in our opinion would frustrate the very purpose for which Congress enacted this legislation." (Emphasis supplied.)

Viewing the record in the instant case as a whole, we do not think that it contains substantial evidence to support the examiner's conclusions. On the entire record, we conclude that the denial of disability benefits to the plaintiff was erroneous.

Therefore, the plaintiff's motion for summary judgment will be granted and the Secretary's motion for summary judgment will be denied.